IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

LEE ANDREW HILGARTNER,      )
                                        )
     Debtor/Appellant,      )
                                        )     Civil Action No. 1:21-cv-01179
                                        )     (RDA/IDD);
     v.                      )     Bankruptcy Case Nos. 20-10695-BFK;
                                          )     20-1049-BFK
                                        )
YASUKO YAGI,               )
                                        )
     Creditor/Appellee.     )

_____

YASUKO YAGI,               )
                                        )
     Plaintiff,          )
                                        )     Civil Action No. 1:21-cv-01123
                                        )     (RDA/IDD);
     v.                      )     Bankruptcy Case Nos. 20-10695-BFK;
                                          )     20-1049-BFK
                                        )
LEE ANDREW HILGARTNER,      )
                                        )
     Defendant.      )

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court on Debtor/Appellant Lee Andrew Hilgartner's ("Hilgartner") appeal of the United States Bankruptcy Court for the Eastern District of Virginia's ("Bankruptcy Court") Findings of Fact and Conclusions of Law ("F&C") and Judgment on the dischargeability and allowability of Creditor/Appellee Yasuko Yagi's ("Yagi") proof of claims. The Court dispenses with oral argument because it would not aid in the decisional process. Fed. R. Civ. P. 78; E.D. Va. Loc. Civ. R. 7(J). The Court has reviewed the Bankruptcy Court record (Dkt. Nos. 4-7), Hilgartner's opening brief (Dkt. 11), Yagi's response brief (Dkt. 12), and the Bankruptcy Court's F&C (Dkt. 11-5) and Report & Recommendation ("Recommendation") (Dkt.

11-5) and Amended Supplement to the Recommendation ("Amended Supplement") (Dkt. 12-1). Having considered the issues presented in this appeal, the Court AFFIRMS in part and REVERSES in part the Bankruptcy Court's dischargeability judgment and ADOPTS in part and AMENDS in part the Recommendation and Amended Supplement of the Bankruptcy Court for the reasons that follow.

## I. BACKGROUND

Ms. Yasuko Yagi is a Japanese citizen and Mr. Lee Hilgartner is a United States citizen residing in the Eastern District of Virginia.  Hilgartner served in the U.S. Army from 1989 until 2012, attaining the rank of Lieutenant Colonel.  During this period, and beginning in June of 2002, Yagi and Hilgartner met in Japan and began a long-distance extra-marital romantic relationship. In April of 2010, Yagi visited Hilgartner in Washington, D.C. for the purpose of obtaining payment for her prior travel expenses to visit him.  On April 23, 2010, Hilgartner picked up Yagi in his car and was "snarling" at her.  Dkt. 11-5 at 4.  During the ensuing car ride, the two engaged in heated argument.  At one point, Hilgartner "reached out with his hand as the car was still in motion at a high rate of speed, grabbed Ms. Yagi by the hair and slammed her head into the passenger-side window – twice – with a great deal of force." *Id.*[1]  Hilgartner then grabbed Yagi and repeatedly pushed her body against the console separating them in the front compartment of the vehicle.  *Id.* at 5.  He also gripped her hands "very forcefully."  *Id.*  Despite Yagi's hysterical crying, Hilgartner continued to grab and push her "violently down into his own thigh."  *Id.*  On May 8, 2010, the parties met again.  While in Yagi's apartment, Hilgartner "became enraged again and grabbed Ms. Yagi by both arms . . . until her hands felt cold."  *Id.* at 7.  Hilgartner admits to grabbing her on

---

[1]  According to Yagi, after the first time Hilgartner slammed her head, she "screamed that it hurts" and he then proceeded to slam her head into the passenger-side window again.  Dkt. 5 at 25:17-20.

the balcony but he claims he did so to prevent her from committing suicide.  Some time after these

incidents, Yagi contacted law enforcement, but Hilgartner was never arrested or charged.  In fact,

the parties continued to see one another and vacationed together.  *Id.* at 8.  While the parties dispute

many of the events that followed during that day, the Bankruptcy Court found Yagi's testimony

more credible than Hilgartner's.  *Id.* at 7.

> On June 7, 2010, Hilgartner signed a statement in which he admitted:

> I, Lee Andrew Hilgartner, on 23 April 2010, out of anger while arguing about transportation costs, did grab Yasuko Yagi, after she slapped my head as a result of rude comments I made, by the hair and hit her head and shoulders into the passenger side door and window, two times, of my rental Toyota Pruis,[sic] while driving on Virginia Highway 7, in the vicinity of McLean, VA.  As a result, Ms. Yagi suffered from Whiplash on the right side of her head, her right shoulder, and right arm; diagnosed at the George Washington University Hospital on 2 May 2010.

> Additionally, on 8 May 2010, while in Ms. Yagi's rental apartment at 601 24th St. NW, in Washington DC, after a heated exchange in which I was to sign a guarantee as assurance to her, I did grab both of her arms forcefully, resulting in bruising on her arms and hands.  She did return to the George Washington University Hospital for a follow-up on her whiplash as well as to have these bruises documented.  In total, Yasuko Yagi had to visit the George Washington University Hospital 5 times, as a result of my actions.

*Id.* at 9.  For fear that Yagi would expose his affair, Hilgartner agreed in the statement to pay her

$80,000.00 in monthly installments of $13,333.00.[2]

> On July 5, 2010, Hilgartner executed a settlement agreement ("Settlement Agreement")

with Yagi, subject to the laws of the District of Columbia, in which he further admitted:

> On or about April 23, 2010, Yasuko Yagi was injured during an incident that involved an altercation between the Parties.  On May 8, 2010, Yasuko Yagi was again injured due to certain contact between her and Lee Andrew Hilgartner.  Lee Andrew Hilgartner acknowledges his responsibility for his infliction of those injuries.  These two incidents comprise, for purposes of this agreement, the "Incidents."

---

[2] Yagi testified that just $50,000.00 to $60,000.00 of this amount was paid to her by Hilgartner.  *See* Dkt. 5 at 77:18-20.  However the unpaid amount is not part of the dispute presented before the Bankruptcy Court.

> In a signed writing dated June 7, 2010, Lee Andrew Hilgartner *acknowledged his factual and legal responsibility for his infliction of Yakuko Yagi's injuries*, and Lee Hilgartner hereby again so acknowledges: I sincerely apologize for my actions toward you, and for the consequences, and for the pain, damage, and suffering I have caused you and your family.

*Id.* at 11 (emphasis added).  The Settlement Agreement further obligated Hilgartner to pay $415,000.00 ("Principal Amount") to Yagi over a specified time period lasting approximately 150 months.  Included in the Principal Amount were attorney's fees associated with the legal work done to secure the Settlement Agreement, Dkt. 11-1 at 2-4.  The Settlement Agreement also required a 15% interest charge on any late payments and up to a $1,000.00 late penalty, *id.* at 3-4, and that Hilgartner secure his payments of the Principal Amount by maintaining a life insurance policy over the pendency of the repayment plan, *id.* at 4.  In the event Hilgartner missed three consecutive payments beyond the cure date, the Settlement Agreement qualified such event as a material breach of the contract and permitted Yagi to pursue legal enforcement.  *Id.* at 4.  And if any suit or action were commenced to enforce or interpret any aspect of the Settlement Agreement, "the prevailing Party . . . shall be entitled to an award against the other Party for the prevailing Party's reasonable attorney's fees and costs incurred both at trial and on any appeal."  *Id.* at 7.

On July 18, 2019, Yagi's counsel sent a demand notice for payment to Hilgartner in the amount of $144,486.88, reflecting more than three months of missed installment payments, late charges, accrued interest, and expenses triggered by the Settlement Agreement.  Dkt. 11-3 at 1-2.  On October 10, 2019, before this Court, Yagi filed a complaint against Hilgartner to enforce the Settlement Agreement.  *See Yagi v. Hilgartner*, No. 1:19-cv-01305-RDA-TCB.  Yagi then moved for entry of a default judgment against Hilgartner and noticed a hearing before this Court on March 6, 2020.  Two days prior to that hearing, Hilgartner filed a Voluntary Petition under Chapter 13 of the Bankruptcy Code ("Chapter 13 Plan").  *See In re Hilgartner*, No. 20-10695-BFK.  That filing

stayed the case before this Court.  As an intervening creditor, Yagi filed a Proof of Claim No. 1-1 for $336,850.25 and objected to the Chapter 13 Plan because she argued her claim was non-dischargeable under Bankruptcy Code § 1328(a)(4).  Hilgartner objected to Yagi's Proof of Claim, arguing (a) she did not have a pre-petition judgment, which he submitted as a perquisite to any non-dischargeable debt under § 1328(a)(4) and (b) the personal injury claims evolved from tort to contract as a result of the Settlement Agreement.  On August 5, 2020, the Bankruptcy Court upheld Yagi's Proof of Claim, finding that § 1328(a)(4) "does not require that damages be awarded in a civil action before a bankruptcy case is filed" and rejected the view that the personal injury claims had merged into the Settlement Agreement.  *In re Hilgartner*, No. 20-10695-BFK, 2020 WL 6875960, at **3-4 (Bankr. E.D. Va. Aug. 5, 2020).[3]

Hilgartner then converted his petition to Chapter 7 on December 3, 2020 and filed a motion to dismiss his bankruptcy case on December 30, 2020.  The Bankruptcy Court dismissed the case without objection on January 27, 2021.  But on February 25, 2021, Hilgartner filed a second Voluntary Petition under Chapter 13—again staying the breach of contract case before this Court. Yagi filed a Proof of Claim No. 4-4 for $463,637.11.  After objecting to this Proof of Claim, Hilgartner moved to convert his case to Chapter 11, which the Bankruptcy Court permitted on May 10, 2021.  That case remains pending.

During Hilgartner's first Chapter 13 bankruptcy case, on July 23, 2020, Yagi filed her Complaint before the Bankruptcy Court, seeking a determination on the dischargeability of Hilgartner's debt to her pursuant to the Settlement Agreement, and an adversary proceeding ("Adversary Proceeding") commenced.  When the Bankruptcy Court dismissed Hilgartner's Chapter 13 Plan, it elected not to dismiss Yagi's Adversary Proceeding once Hilgartner had filed

---

[3]  The § 1328(a)(4) opinion is not the subject of this Court's review on appeal.

his second bankruptcy petition.  The Bankruptcy Court held a hearing on the merits of Yagi's Complaint and her Proof of Claim on May 21, 26, and 27, 2021 and issued its F&C and Recommendation on the Personal Injury Proof of Claim on July 23, 2021.

In its ruling, the Bankruptcy Court first addressed Yagi's Complaint and determined that only certain of Hilgartner's obligations under the Settlement Agreement were non-dischargeable under 11 U.S.C. § 523(a)(6).  The Bankruptcy Court first found that Hilgartner's June 7, 2010 statement, his admissions in the recitals of the Settlement Agreement, and his answer in interrogatories to be "written acknowledgements of the wrongfulness of his conduct."  The Bankruptcy Court therefore found that Hilgartner acted on April 23 and May 8, 2010 willfully and maliciously.  Then, the Bankruptcy Court concluded that $229,045.00—the Principal Amount in the Settlement Agreement, $415,000.00, less the principal payments made by Hilgartner prior to filing for bankruptcy, $189,955.00—represented the amount stemming from the Settlement Agreement which Hilgartner could not discharge in bankruptcy.  Additionally, the court noted that Hilgartner, through his counsel, stipulated to this methodology in determining actual damages.

However, the Bankruptcy Court concluded that other amounts payable under the Settlement Agreement—including the fees and interest associated with late payments, the cost to maintain a life insurance policy to collateralize the repayment schedule, and any attorney's fees and costs associated with enforcing the Settlement Agreement—were dischargeable.  The Bankruptcy Court reasoned that these amounts "did not flow directly from the non-dischargeable conduct on April 23rd and May 8th" and were instead "contract-based damages" not directly emanating from the principal amount of Yagi's claim.  Dkt. 11-5 at 20, 22.

The Bankruptcy Court separately issued a Recommendation as to the allowance of Yagi's Proof of Claim because of its personal injury character, which falls outside the jurisdiction of

bankruptcy courts pursuant to 28 U.S.C. § 157(b)(2)(B).  In its Recommendation, the Bankruptcy Court advised that this Court allow the $229,045.00 remainder of the Principal Amount of the claim as well as the pre-petition 15% late payment interest fees that had accrued.  As to the late charges totaling $92,000, the Bankruptcy Court recommended disallowance because that figure resulted from a "liquidated damages" clause that acted as a "penalty" in violation of the laws of the District of Columbia.  Dkt. 11-5 at 23.  As to Yagi's claimed travel expenses of $25,425.00, the Bankruptcy Court also recommended disallowance because the corroborative documents were entirely in Japanese and without translation.  The Bankruptcy Court further recommended disallowing any amount required to purchase and maintain a life insurance policy because this claim for equitable relief could have been reduced to a claim for money damages pursuant to 11 U.S.C. § 101(5)(B) and Yagi presented no supporting evidence for the cost of this policy at trial. As to attorney's fees and costs in connection with the enforcement of the Settlement Agreement, the Bankruptcy Court recommended allowing such dischargeable fees and costs because Yagi enjoyed a basis under non-bankruptcy law to obtain post-petition attorney's fees.

The Bankruptcy Court then directed Yagi to supplement her Proof of Claim with an Affidavit of Legal Fees and Costs following the entry of the Judgment Order.  She did so and Hilgartner did not object to the proposed fees and costs.  Yagi and Hilgartner each filed objections to the F&C and Recommendation on August 5, 2021.  *See* Bankruptcy Case No. 20-01049-BFK, Dkt. Nos. 71-72.  On October 18, 2021, the Bankruptcy Court issued an Amended Supplement conducting a lodestar analysis and recommending that this Court approve Yagi's proposed fees and costs.  Dkt. 12-1 at 1-5.

## II. STANDARD OF REVIEW

"When reviewing a decision of the Bankruptcy Court, a district court functions as an appellate court and applies the standards of review generally applied in federal courts of appeal." *Paramount Home Entm't Inc. v. Circuit City Stores, Inc.*, 445 B.R. 521, 526-27 (E.D. Va. 2010) (citation omitted).  Thus, the district court reviews questions of fact under the "clearly erroneous" standard.  *Id.*  "The clear error standard requires 'a reviewing court [to] ask whether on the entire evidence,' it is 'left with the definite and firm conviction that a mistake has been committed.'" *United States v. Span*, 789 F.3d 320, 325 (4th Cir. 2015) (quoting *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (internal quotation marks and citations omitted)).  Legal conclusions are reviewed *de novo*.  *In re Harford Sands Inc.*, 372 F.3d 637, 639 (4th Cir. 2004).  In cases where the issues present mixed questions of law and fact, the Court employs "a hybrid standard, applying to the factual portion of each inquiry the same standard applied to questions of pure fact and examining *de novo* the legal conclusions derived from those facts."  *Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond*, 80 F.3d 895, 905 (4th Cir. 1996) (internal citation omitted).  Decisions committed to the bankruptcy court's discretion are reviewed for abuse of discretion.  *See Robbins v. Robbins (In re Robbins)*, 964 F.2d 342, 345 (4th Cir. 1992).

## III. ANALYSIS

Hilgartner raises four issues on appeal:

1. Whether the Bankruptcy Court made a correct determination related to the dischargeability of Yagi's Principal Amount claim under Section 523(a)(6)?

2. Whether Yagi's Proof of Claim for interest, late charges, and attorney's fees and costs are allowable or otherwise dischargeable?

3. Whether the outstanding Principal Amount was correctly calculated?

4. Whether, at trial, Yagi properly introduced a summary of her claim before the Bankruptcy Court?

As part of the appellate inquiry, this Court also considers the Bankruptcy Court's related Recommendation and Amended Supplement.

For the reasons that follow, this Court affirms in part and reverses in part the Bankruptcy Court's very comprehensive determinations after considering the four issues raised by Hilgartner on appeal and further adopts in part and amends in part the Bankruptcy Court's Recommendation and Amended Supplement as to the allowability and amounts of Yagi's Proof of Claim. Specifically, this Court affirms the Bankruptcy Court's determination that the outstanding Principal Amount is non-dischargeable but reverses the determination that the attorney's fees and interest are dischargeable. This Court further adopts the Bankruptcy Court's Recommendation to allow Yagi's attorney's fees and interest claims and to disallow the late charges, travel expenses, and life insurance claims and amends the Recommendation to require that Yagi update the allowable interest amount to be calculated based on outstanding payments less the late charges.

A. Non-dischargeability of Yagi's Outstanding Principal Amount

Hilgartner argues that Yagi's claim sounds in contract rather than in tort. Because Yagi seeks to recover payment obligations arising from the Settlement Agreement rather than directly from the tortious acts which gave rise to the Settlement Agreement, Hilgartner contends that Yagi is seeking to collect solely on a breach of contract claim. As a result, Hilgartner maintains that Yagi's claim against Hilgartner is not based on his willful and malicious conduct but rather on his failure to comply with the terms of the Settlement Agreement. Without evidence of such conduct, Yagi's breach of contract claim has no place within the non-dischargeable exceptions housed in 11 U.S.C. § 523(a).

In response, Yagi submits that the U.S. Supreme Court decision in *Archer v. Warner*, 538 U.S. 314 (2003) supports her position that the execution of a settlement agreement does not suddenly convert a tort claim into a contract claim. Moreover, according to Yagi, the Bankruptcy Court correctly determined that Hilgartner's tortious conduct was both willful and malicious as required by § 523(a)(6) and makes the Principal Amount stemming from the assaults not dischargeable in bankruptcy.

This Court considers the issue presented as squarely resolved by the U.S. Supreme Court in *Archer*—a case originating in the Fourth Circuit. There, the Court held that while the debt for which a creditor sought collection was not for money obtained by the underlying tort but rather for the money promised in a settlement contract arising out of the tort, that debt retained the character of the underlying tort. *See Archer*, 538 U.S. at 321 ("A debt embodied in the settlement of a fraud case 'arises' no less 'out of' the underlying fraud than a debt embodied in stipulation and consent decree.") (quoting *Brown v. Felsen*, 442 U.S. 127, 138 (1979)); *see also In re DeTrano*, 326 F.3d 319, 322 (2d Cir. 2003) ("[I]f the tort claims against [the debtor] would have created a non-dischargeable debt under § 523(a)(4), had those claims been litigated to judgment in [the creditor's] favor, then it is no defense for [the debtor] to state that he has replaced that possible liability with a dischargeable contractual obligation through the settlement agreement."). That is because bankruptcy courts should consider "the true nature of the debt." *Brown*, 442 U.S. at 138.

Here, Hilgartner's arguments ignore controlling Supreme Court precedent and, in conducting its *de novo* review, this Court arrives at the same conclusion as did the learned Bankruptcy Judge. For purposes of bankruptcy, the debt sought to be collected from the Principal Amount of the Settlement Agreement assumes the same nature as the underlying tortious conduct precipitating the agreement in the first place. *See, e.g.*, *In re Graham*, No. 19-10283, 2020 WL

8184300, at *1 (Bankr. S.D. Ohio 2020) (rejecting Hilgartner's exact argument and instead holding that "the settlement of a claim does not change the nature of the underlying debt").

In evaluating the dischargeability of tortious conduct, courts consider whether such conduct amounts to "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The creditor carries the burden of showing by a preponderance of the evidence that the conduct for which the "debt" is sought qualifies as "willful and malicious." *See Grogan v. Garner*, 498 U.S. 279, 286-87 (1991). "Debt" is defined as a "liability on a claim." 11 U.S.C. § 101(12). A "claim" is defined to include any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 11 U.S.C. § 101(5)(A). The evidence must show "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to the injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). Further, the debtor must have intended "the consequences of an act, not simply the act itself." *Id.* at 61-62 (citing Restatement (Second) of Torts § 8A, cmt. a, at 15 (1964)).

A § 523(a)(6) injury "requires intent" to injure and "does not encompass mere negligent or reckless conduct." *In re Muhs*, 923 F.3d 377, 387 (4th Cir. 2019); *In re Duncan*, 448 F.3d 725, 729 (4th Cir. 2006). The Fourth Circuit defines "willful" as "deliberate or intentional," *In re Stanley*, 66 F. 3d 664, 667 (4th Cir. 1995), such that the debtor "acted with 'substantial certainty [that] harm [would result] or a subjective motive to cause harm.'" *In re Parks*, 91 F. App'x 817, 819 (4th Cir. 2003) (quoting *In re Miller*, 156 F.3d 598, 603 (5th Cir. 1998)). Bankruptcy courts in this circuit have defined "malice" as "an act causing injury without just cause or excuse." *In re Ngo*, No. 20-12224-BFK, 2021 WL 2787601, at *7 (Bankr. E.D. Va. July 2, 2021) (citing *In re*

*Sparrow*, 306 B.R. 812, 838 (Bankr. E.D. Va. 2003); *In re Powers*, 227 B.R. 73, 76 (Bankr. E.D. Va. 1998)).

Here, the Bankruptcy Court, acting in its factfinder capacity in the Adversary Proceeding pursuant to 11 U.S.C. § 157(c)(1), issued a factual determination that on April 23, 2010, "Mr. Hilgartner assaulted Ms. Yagi" by "smash[ing] her head into the window, twice" and "push[ing] her down, forcefully." Dkt. 11-5 at 7. The Bankruptcy Court also made the factual determination that on May 8, 2010, "Mr. Hilgartner grabbed [Ms. Yagi] by both arms and held on to her so tightly that it impeded the blood flow to her hands" and that such conduct "was not justified by any suicide attempt on Ms. Yagi's part."[4] *Id.* at 8. Considering multiple signed statements by Hilgartner acknowledging that he did assault Yagi and that he took "factual and legal responsibility for his infliction of Yakuko Yagi's injuries," this Court finds no clear error.

This Court reviews *de novo* the legal determination that such acts constituted "malicious and willful" conduct. *Gilbane*, 80 F.3d at 905. Taking Yagi's account of the assaults as true, Hilgartner's behavior on April 23, 2010 and May 8, 2010 demonstrated "deliberate or intentional" conduct meant to harm Yagi. Dkt. 11-5 at 4 (Hilgartner "reached out with his hand as the car was

---

[4] This Court also agrees with the Bankruptcy Court's determination that Hilgartner's duress defense does not demonstrate that Hilgartner entered into the Settlement Agreement "under the influence of such fear as precludes him from exercising free will and judgment." *Dyer v. Bilaal*, 983 A.2d 349, 360 (D.C. 2009) (quoting *Sind v. Pollin*, 356 A.2d 653, 656 (D.C. 1976)). District of Columbia law indeed makes clear that, with respect to entering into a settlement agreement, a duress defense does not arise in the face of "mounting weariness, frustration, and confusion" or "dismay" lasting over two years in advance of signing the agreement. *Dyer*, 983 A.2d at 360. Had Yagi forced Hilgartner to enter into the settlement agreement *while* threatening suicide, he may very well have a defense to void the contract. But the record, as the Bankruptcy Court identified, indicates that Hilgartner, despite difficult personal circumstances, had every opportunity to engage counsel and that he negotiated the agreement over the course of several months. *See* Dkt. 5 at 82:1-3 (Yagi testifying that the negotiation of the Settlement Agreement lasted "probably half a year or could be seven months or maybe a bit—a little longer"). Any of Hilgartner's fears arose out of circumstances he invited upon himself, and he had ample time to consider his approach to resolving those circumstances.

still in motion at a high rate of speed, grabbed Ms. Yagi by the hair and slammed her head into the passenger-side window – twice – with a great deal of force."); *id.* at 5 (describing how Hilgartner then proceeded to grab Yagi and repeatedly pushed her body against the console separating them in the front compartment of the vehicle); *id.* at 7 (describing how Hilgartner "became enraged again and grabbed Ms. Yagi by both arms . . . until her hands felt cold").  These acts also were malicious as they "caus[ed] injury without just cause or excuse."  *In re Ngo*, 2021 WL 2787601, at *7; *see also* Dkt. 11-5 at 8 (Bankruptcy Court finding, with no clear error, that Hilgartner's actions were "not justified by any suicide attempt on Ms. Yagi's part").  Accordingly, the tortious conduct exhibited by Hilgartner which gave rise to the Settlement Agreement meets the carve-out requirement of 11 U.S.C. § 523(a)(6).  A finding of non-dischargeability also meets the overarching policy of § 523(a)(6), which "is aimed at the type of both socially and morally reprehensible conduct that is not deserving of the fresh-start policy which underlines the Bankruptcy Code."  *In re* West, 446 B.R. 813, 815 (Bankr. N. D. Ohio 2010).  The outstanding Principal Amount which has not been paid by Hilgartner to Yagi is therefore non-dischargeable.

    B.  Whether Yagi's Proof of Claim as to those amounts in excess of the outstanding Principal Amount are allowable or otherwise dischargeable?

In its Recommendation and Amended Supplement, the Bankruptcy Court recommended that this Court award Yagi with $65,073.55 in dischargeable pre-petition interest using the 15% per annum rate contained in the Settlement Agreement for the late payments Hilgartner had accrued at the time of filing for bankruptcy.  Dkt. 11-5 at 23.  The Bankruptcy Court further recommended that all late charges totaling $92,000 be disallowed because that amount sprung from a "liquidated damages" clause and acted as a "penalty" in violation of the laws of the District of Columbia.  Dkt. 11-5 at 23.  As to Yagi's claimed travel expenses of $25,425.00, the Bankruptcy Court also recommended disallowance because the corroborative documents were entirely in

Japanese and without translation.  Lastly, the Bankruptcy Court recommended disallowing any amount required to purchase and maintain a life insurance policy because this claim for equitable relief could have been reduced to a claim for money damages pursuant to 11 U.S.C. § 101(5)(B), and Yagi presented no supporting evidence for the cost of this policy at trial.

Hilgartner argues that the interest and attorney's fees related to collection of the Principal Amount are not allowable claims and, even if they were, they are dischargeable.  For one, Hilgartner suggests that the Bankruptcy Code provides no allowance for an award of post-judgment interest on either a personal injury judgment or a settlement agreement.  And even if such interest were allowed, it flows from the terms of the contract rather than the tort.  Hilgartner argues the same as a defense against awarding attorney's fees in the enforcement of the Settlement Agreement.  Additionally, Hilgartner argues that attorney's fees accrued over the course of the Adversary Proceeding and Hilgartner's bankruptcy cases cannot be awarded unless a court finds its positions are "not substantially justified." Dkt. 11 at 9 (citing 11 U.S.C. § 523(d)).  Hilgartner objected to the Recommendation on similar grounds.  *See* Bankruptcy Case No. 20-01049-BKH, Dkt. 71.

Yagi responds in turn by first noting Hilgartner never objected to the Amended Supplement issued by the Bankruptcy Court, which awarded $81,507.00 in attorney's fees to Yagi and that the issue of dischargeability had actually been resolved by the Bankruptcy Court in Hilgartner's favor rendering the dischargeability inquiry moot.  But beyond that issue, Yagi submits that she is entitled to post-petition attorney's fees under U.S. Supreme Court and Fourth Circuit precedent and that such fees are not dischargeable because they are directly related to collecting on a non-dischargeable sum—the outstanding Principal Amount.  For this same reason, Yagi argues that pre-petition interest is also allowable and non-dischargeable.  Lastly, Yagi objected to the

Recommendation to deny enforcing the maintenance of Hilgartner's life insurance because that claim is not reducible to money damages, the premiums on the life insurance claim remain current, those premiums cannot be predicted into the future due to variable rates, and Hilgartner is the only individual who can obtain the life insurance policy. *See id.*; Dkt. 74 at 2-4.

### 1. Allowability of Certain of Yagi's Claims

"[W]e generally presume that claims enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed." *Travelers Cas. & Surety Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 452 (2007). "[P]ost-petition costs arising out of pre-petition contracts more generally" fall within the *Travelers* gamut. *See SummitBridge Nat'l Invs. III, LLC v. Faison*, 915 F.3d 288, 291 (4th Cir. 2019). In the attorney's fees context, while the traditional American Rule holds that "the prevailing litigant is ordinarily *not entitled* to collect a reasonable attorneys' fee from the loser," *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975) (emphasis added), this default rule "can, of course, be overcome by statute," or by "an 'enforceable contract' allocating attorney's fees." *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 717 (1967). Similarly, the Bankruptcy Code defines "claim" broadly to include "contingent" "right[s] to payment" so long as that right "arose pre-petition." *SummitBridge*, 915 F.3d at 292 (quoting 11 U.S.C. § 101(5)(A)).

Here, the Bankruptcy Court correctly allowed the interest and attorney's fees claims because they derive independently as a matter of the Settlement Agreement and do not offend D.C. law. *See id.* at 297 ("Allowing creditors [] who have bargained specifically for attorneys' fees under state law to enforce those rights in bankruptcy is fully consistent with that principle [of deference to state law], even if it reduces the pool of assets otherwise available."); *see also Soares v. Lorono*, No. 12-cv-05979, 2015 WL 151705, at *21 (N.D. Cal. Jan. 12, 2015) (permitting post-

petition attorney's fees because settlement agreement governed allowance of attorney's fees in collection).  Nothing in the Bankruptcy Code, including the requirement that a bankruptcy court "determine the amount of [the] claim . . . as of the date of the filing of the petition," 11 U.S.C. § 502(b), forecloses the awarding of attorney's fees and interest as provided for in the Settlement Agreement.  *See SummitBridge*, 915 F.3d at 293 (dispelling a flat interpretation of § 502(b) that suggests indeterminable claim amounts at the time of the petition are automatically disallowable); *see also In re Derby*, No. 17-34385-KLP, 2019 WL 1423084, at *4 n.17 (Bankr. E.D. Va. Mar. 28, 2019) (in light of *SummitBridge*, for purposes of bankruptcy law, "a 'claim' includes post-petition costs, if bargained for in the pre-petition contract" and thus includes "unsecured claims for post-petition attorneys' fees based on valid pre-petition contracts, if allowed under state law" and "must be allowed under § 502 unless one of its enumerated exceptions applies").  Neither do any of the exceptions contained in § 502(b) square with the post-petition interest and attorney's fees claimed by Yagi.  *See Travelers*, 549 U.S. at 449-54; 11 U.S.C. §§ 502(b)(1)-(9).  Indeed, contracts pursuant to D.C. law providing for post-petition awards have recently been enforced despite the filing of a bankruptcy petition.  *See, e.g.*, *In re Davenport*, 627 B.R. 705, 731-32 (Bankr. D.D.C. 2020) (applying the *Travelers* rule to allow post-petition fees and costs).

Furthermore, this Court agrees with the Bankruptcy Court's Recommendation and Amended Supplement as to the allowable amount of attorney's fees.  This Court finds the lodestar analysis and conclusion reached by the Bankruptcy Court as to the $81,507.00 amount reasonable.  *See Lang v. Va. Beach Life Saving Serv., Inc.*, No. 2:12-cv-574, 2013 WL 12095215, at *3 (E.D. Va. Aug. 23, 2013).  The Bankruptcy Court properly considered the twelve *Johnson* factors outlined and adopted in *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 (4th Cir. 1978) (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)).  The award reasonably

16

reflects the time spent on the case, the necessity of the Japanese language, the fact that Hilgartner filed for bankruptcy twice and converted to different Chapters, and the degree of success obtained on Yagi's behalf before the Bankruptcy Court.

This Court next considers the Bankruptcy Court's recommendation to disallow the $92,000.00 in late charges pursuant to Section 1(g) of the Settlement Agreement and the award of interest. As *Travelers* instructs, this Court must consider whether the state law governing the applicable contract prevents a particular post-petition award. 549 U.S. at 452. D.C. law provides that a "liquidated damages clause is valid unless it is found to constitute a penalty." *Burns v. Hanover Ins. Co.*, 454 A.2d 325, 327 (D.C. 1982) (citing *Order of AHEPA v. Travel Consultants, Inc.*, 367 A.2d 119 (D.C. 1976)). While the deciding line between "enforceable liquidated damages provisions and unenforceable penalties" is not definitive, D.C. courts ask if the provision "is a reasonable protection against uncertain future litigation" or if "the stipulation is designed to make the default of the party against whom it runs more profitable to the other party than performance would be?" *Davy v. Crawford*, 147 F.2d 574, 575 (D.C. Cir. 1945). And although "[t]he common law views liquidated damages clauses with a gimlet eye," *Dist. Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 723 (D.C. 2003), "courts have generally upheld liquidated damages provisions." *Proulx v. 1400 Penn. Ave., SE, LLC*, 199 A.3d 667, 674 (D.C. 2019); *see also id.* at 673 ("Today the trend favors freedom of contract through the enforcement of stipulated damage provisions as long as they do not clearly disregard the principle of compensation.").

For approximately six months, Hilgartner and Yagi bargained at arm's length for the provisions embodying the Settlement Agreement. *See supra*, note 4. Because this Court considers Hilgartner's duress argument unavailing, this Court examines whether the late charges and interest qualify as a penalty. Based on the late charges and interest table provided by Yagi before and at

17

trial, the unpaid payments were $65,681.56 while the total late charges were $92,000.00 and the total interest was $65,073.55.

This Court agrees with the Bankruptcy Court's assessment that the late charges amount to a penalty and are therefore void as a matter of D.C. common law. That amount alone represents a nearly 50% increase in payout under the agreement, which would leave Yagi far more profitable than she otherwise would be under the standard payout schedule mandated by the Settlement Agreement. While that amount, standing alone, may not constitute a "shockingly disproportionate" figure, when combining it with the late interest fees, Yagi is receiving nearly a 250% windfall. *See Bassin*, 828 A.2d at 724-25; *see also Council v. Hogan*, 556 A.2d 1070, 1072 (D.C. 1989) ("[T]he liquidated damages must not be disproportionate to the level of damages reasonably foreseeable at the time of the making of the contract."). And due to the compounding effect of the interest payment, that windfall would climb even more if Hilgartner had not filed his petition when he did.

To be clear, other D.C. liquidated damages provisions have been upheld in large part when considering the ongoing business costs assumed by a creditor; but no such issue appears apparent here. *See Proulx*, 199 A.3d at 674 n.13 (collecting cases). Rather, the Principal Amount agreed to in the Settlement Agreement reflects actual damages flowing from a series of torts. Yagi has not detailed any ongoing healthcare costs in connection with the injuries she sustained. *See, e.g.*, Dkt. 5 at 60:21-62:2 (Yagi testifying that while she experienced lingering physical effects following the 2010 incidents, including the fact that she "could hardly work," she indicated her condition had improved and did not disclose any ongoing healthcare costs stemming from the injury); *id.* at 78:12-18 (Yagi testifying that the initial signed writing on June 7, 2010 between her and Hilgartner was meant to address her medical costs stemming from her injuries for the time

being "until the entirety of her injury could be found out," at which time the parties executed the Settlement Agreement).  Under these facts, the risk of profiteering is more pronounced.  This Court further evaluates testimony at trial confirming that the interest calculation includes the late charges being added to the principal.  *Id.* at 97:4-7.  As such, the "Outstanding Amount due" should not include the "Late Payment Fee Due" when calculating the allowable interest claim given the determination that the late charges are disallowed.  *See generally* Dkt. 11-2.

This Court finds no clear error as to the Bankruptcy Court's recommendation to disallow the $25,425.00 claimed by Yagi as travel expenses and other miscellaneous expenses incurred in attempting to enforce the Settlement Agreement.[5]

Lastly, this Court adopts the Bankruptcy Court's recommendation to disallow the life insurance policy claim.  The Settlement Agreement requires the maintenance of a life insurance policy to secure the Principal Amount.  Dkt. 11-1 at 3-5.  And Yagi's interest in the life insurance contract falls within the definition of a "claim" pursuant to 11 U.S.C. § 101(5)(B).[6]  Because the damages resulting from the breach of maintaining the life insurance contract are "fully compensable by a judgment for money damages," the amount of this claim can be measured.  *In re Granati*, 270 B.R. 575, 586 (Bankr. E.D. Va. 2001); *see also* Dkt. Case No. 21-cv-1123, Dkt. 2 at 85-87 (providing annual premium figures and therefore offering a measurable basis for reducing

---

[5]  Neither party objected to this determination by the Bankruptcy Court, and therefore this Court may employ a "clear error" standard of review.  *See Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005) (holding that in the absence of any objections to a Report and Recommendation, the Court "need not conduct a *de novo* review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation'").

[6]  A "claim" under the Bankruptcy Code includes the "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured."  11 U.S.C. § 101(5)(B).

the equitable claim to money damages).  Yagi failed to provide the Bankruptcy Court with any estimate as to the value of that amount.  Therefore, no basis exists to assert a claim for the life insurance contract.

Accordingly, this Court will remand to the Bankruptcy Court solely on the matter of calculating the allowable interest amount after removing the inclusion of all late charges as part of the "Outstanding Amount due."  *See, e.g.*, *CresCom Bank, successor by merger to Community FirstBank v. Terry*, 610 F. App'x 221, 236 (4th Cir. 2015) (remanding to lower court for the recalculation of attorney's fees); *In re Lambert Oil Co., Inc.*, 347 B.R. 508, 511 (W.D. Va. 2006) (remanding to bankruptcy court with an instruction to recalculate prejudgment interest).

## 2.  Dischargeability of Allowed Claims

This Court next turns to the Bankruptcy Court's 28 U.S.C. § 157(b)(2)(B) determination, that the attorney's fees related to the enforcement of the Settlement Agreement and the pre-petition interest, as amended by this Court's opinion, are dischargeable claims.

The Supreme Court has provided some guidance on dischargeability of related costs associated with an underlying non-dischargeable claim.  In *Cohen v. de la Cruz*, 523 U.S. 213, 218 (1998), the Court held that an award of treble damages in connection with a fraud action met the definition of a "debt" under the Bankruptcy Code and qualified for exception to discharge under § 523(a)(2)(A).  *See also id.* ("Once it is established that specific money or property has been obtained by fraud, however, 'any debt' arising therefrom is excepted from discharge.").  In reviewing § 523(a)'s remedial scheme, including § 523(a)(6), the Court interpreted "debt for" to mean "'debt as a result of,' 'debt with respect to,' 'debt by reason of,' and the like."  *Id.* at 220 (citing American Heritage Dictionary 709 (3d ed. 1992); Black's Law Dictionary 644 (6th ed. 1990)); *see also id.* ("Because each use of 'debt for' in § 523(a) serves the identical function of

20

introducing a category of non-dischargeable debt, the presumption that equivalent words have equivalent meaning when repeated in the same statute has particular resonance here.") (internal citation omitted).  The Court added that Congress did not wish to blanket limit the scope of costs covered within the § 523(a) carve-out "to that portion of the debtor's liability representing a restitutionary—as opposed to a compensatory or punitive—recovery."  *Id.* at 222; *see, e.g.*, § 523(a)(7) (explicitly barring discharge of debts under certain circumstances if the debt "is not compensation for actual or pecuniary loss").

As to the dischargeability of attorney's fees and other costs, courts generally adhere to either one of two views.  The majority "Statutory/Contractual Basis" view applied by the Second, Fifth, Sixth, and Eleventh Circuits deems attorney's fees and interest non-dischargeable as part of the debt excepted from discharge "only where there originally existed some statutory or contractual basis for [those fees and interest]."  *In re Beale*, 253 B.R. 644, 651 (Bankr. D. Md. 2000) (collecting cases); *see also In re Atchison*, 255 B.R. 790, 793 (M.D. Fla. 2000) ("[I]t is clear that *Cohen* does not itself create an independent right to attorney's fees for the benefit of a party who prevails in a Section 523 dischargeability proceeding. Instead, it clarifies that attorney's fees supported by statute [or contract] are included in the debt that may be determined to be non-dischargeable.").  The minority "Status Dependent" view instead measures the dischargeability of ancillary fees and costs based on the dischargeability of the underlying debt.  *See In re Florida*, 164 B.R. 636, 639 (9th Cir. BAP 1994) ("Ancillary obligations such as attorneys' fees and interest may attach to the primary debt; consequently, their status depends on that of the primary debt."); *Klingman v. Levinson*, 831 F.2d 1292, 1296-97 (7th Cir. 1987) (same); *In re Hunter*, 771 F.2d 1126, 1131 (8th Cir. 1985) (same); *Duphily v. DuPhily*, 52 B.R. 971, 978 (D. Del. 1985) (citing *In re Chambers*, 36 B.R. 42 (Bankr. D. Wis. 1984)) ("[T]he dischargeability of ancillary obligations

21

such as attorneys' fees turn[s] on the dischargeability of the underlying debt[.]"); *In re Sposa*, 31 B.R. 307, 310 (Bankr. E.D. Va. 1983) ("Ancillary obligations, such as attorney's fees, stand or fall (i.e. dischargeable or non-dischargeable) with the primary debt.").  Although the Fourth Circuit has remained largely silent on the broader question of dischargeability of ancillary obligations, bankruptcy courts sitting in this circuit have applied both views.  *See, e.g.*, *Beale*, 253 B.R. at 652; *In re Combs*, 543 B.R. 780, 796 (Bankr. E.D. Va. 2016) ("Courts reach such a conclusion where the obligation underlying the award of attorney fees is also non-dischargeable."); *In re Ziegler*, 109 B.R. 172, 176-78 (Bankr. W.D.N.C. 1989); *but see also In re Rountree*, 478 F.3d 215, 222 (4th Cir. 2007) (clarifying that *Cohen* is not to be read to make all liability flowing from 523(a)(2) fraud automatically non-dischargeable).

Whether this Court adopts the majority or minority view, it reaches the same conclusion: the allowable attorney's fees and interest outlined in the Settlement Agreement is non-dischargeable.  Under the majority formulation, the Settlement Agreement contains the key ingredient—provisions to enforce the attorney's fees and interest.  With an independent contractual basis for these awards, this Court finds that such awards are contained within the overarching debt deemed non-dischargeable under § 523(a)(6).

Applying the minority view requires the same result.  Given the Bankruptcy Court and this Court's agreement that the Principal Amount secured by the Settlement Agreement is non-dischargeable under § 523(a)(6), the ancillary allowable enforcement and collection fees and costs contemplated by the Settlement Agreement are also non-dischargeable.  While the Bankruptcy Court attempts to distinguish this case from the facts in *Cohen*, this Court sees no significant difference in the time passed to secure an award for actual damages in connection with Yagi's injuries, which occurred years prior to the Settlement Agreement, and the attorney's fees and

interest which flow directly from that agreement for the express purpose of enforcing its terms. Both the fees and interest are mechanisms to enforce and collect on the Principal Amount which represents compensation for Yagi's injuries. *See In re Ziegler*, 109 B.R. at 175-76 (explaining that the minority rule emerged from custodial support rights cases and the view that the fees spent to enforce spousal arrangements were "directly related" to the underlying § 523(a)(5) debt and were therefore also non-dischargeable"). The Principal Amount and the attorney's fees and interest are inextricably linked in making Yagi whole.

The Bankruptcy Court cites no authority for the proposition that a settlement award flowing from tortious conduct which may be deemed non-dischargeable pursuant to § 523(a)(6) does not extend to the ancillary costs meant to enforce and collect on that contract. Illustratively, in one of the rare instances in which ancillary costs on a non-dischargeable claim were deemed dischargeable, the bankruptcy court ruled that those costs were the product of a security instrument "created after the events establishing a non-dischargeable claim took place, and [the creditor's] right to a non-dischargeable claim [was] not based on [that instrument]." *In re Kelley*, No. 07-01152-T, 2008 WL 8013409, at *14 (Bankr. S.D. Cal. July 15, 2008). Whereas here, Yagi's right to the Principal Amount undergirding her personal injury claim, *and not the personal injury claim itself*, arises as a result of the Settlement Agreement.

Moreover, this Court observes that the Principal Amount already encompasses attorney's fees charged in connection with the negotiation of the Settlement Agreement in the first instance. Dkt. 11-1 at 1-2 (requiring that Hilgartner pay certain amounts to Yagi's attorney directly under Sections 1(a)-(c)). It is axiomatic that the non-dischargeability of attorney's fees in connection with the execution of the Settlement Agreement logically extends to those attorney's fees in connection with the enforcement of the Settlement Agreement. *See In re Steward*, No. 16-00479,

23

2017 WL 4842366, at *3 (Bankr. D.D.C. Oct. 18, 2017) (considering damages "that are proximately related to the debtor[] incurring the [] non-dischargeable debt" also non-dischargeable because they may be treated "as an incidental feature of the non-dischargeable debt"); *see also In re Hathaway*, 364 B.R. 220, 250 (Bankr. E.D. Va. 2007) (awarding non-dischargeable attorney's fees in connection with the enforcement of a settlement agreement concerning a non-dischargeable underlying claim pursuant to §§ 523(a)(2), (4)); *In re Foster*, 38 B.R. 639, 642 (Bankr. M.D. Tenn. 1984) ("When a debt evidenced by a note or other contract allowing attorneys' fees and other costs of collection is determined non-dischargeable, the attendant attorneys' fees and costs are similarly non-dischargeable.").  For purposes of dischargeability analysis, separating fees spent to execute a settlement agreement from fees spent to enforce that same agreement amounts to a distinction without a difference.  Accordingly, the attorney's fees and interest represent debts directly attributable to the enforcement of the underlying personal injury compensation due to Yagi.  *Cf. Cohen*, 523 U.S. at 220.

The Bankruptcy Court's reliance on the American Rule also ignores the fact that the attorney's fees and interest arise out of contract.  As discussed *supra*, this default rule "can, of course, be overcome by statute," or by "an 'enforceable contract' allocating attorney's fees." *Fleischmann*, 386 U.S. at 717; *see also In re Combs*, 543 B.R. at 797 ("The award of attorney fees for pursuing a non-dischargeability action where the underlying agreement or order provides for such fees in the event enforcement for noncompliance is necessary comports with the American Rule.  However, in the absence of contemplation of such fees, the American Rule prohibits such award in non-dischargeability actions.").  Nor does the American Rule speak to the dischargeability of a claim.

24

Accordingly, this Court while understanding the analytical perspective of the learned Bankruptcy Judge, reverses the Bankruptcy Court's determination that the allowable attorney's fees and interest are dischargeable.

### C.  Whether the Non-Dischargeable Outstanding Principal Amount was Correctly Calculated?

In the event this Court affirmed the Bankruptcy Court's ruling that the Principal Amount was non-dischargeable, Hilgartner contends that any of that amount due after the date of his bankruptcy filing is in fact dischargeable.  In other words, because Hilgartner filed his first bankruptcy petition on March 4, 2020, he argues that any future payments contemplated as part of the Principal Amount in the Settlement Agreement are to be treated as a different variety of indebtedness than that which preceded the filing of his petition.  Applying that framework to calculating the non-dischargeable amount, Hilgartner maintains that there remained 49 payments totaling $123,000.00 which had not been called due at the time of Hilgartner's first bankruptcy filing.  Thus, of the $229,045.00 that Hilgartner had not paid to Yagi pursuant to the Principal Amount, only $106,045.00 of that sum qualified as a non-dischargeable debt, with the remaining $123,000.00 considered dischargeable.  Yagi argues that the original $415,000.00 Principal Amount is non-dischargeable because it was "a direct and proximate result of [Hilgartner's] willful and malicious actions against her."  Dkt. 12 at 14.

This Court agrees with the Bankruptcy Court and affirms its finding that the $229,045.00 figure represents the entire non-dischargeable outstanding Principal Amount due to Yagi per the terms of the Settlement Agreement.  While Hilgartner argues there is no acceleration clause in the Settlement Agreement, this Court reads Section 1(g) as permitting Hilgartner to seek legal enforcement of the payment of the outstanding Principal Amount upon the occurrence of a material breach.  In this case, if Hilgartner failed to make three consecutive payments under the Principal

Amount repayment schedule, he trips Section 1(g)'s material breach qualifier.  Yagi then retains the right to enforce the terms of the Settlement Agreement.  Here, Hilgartner had failed to make at least three consecutive payments as required by the Settlement Agreement, received a notice of the like, and subsequently filed for bankruptcy.  *See* Dkt. 11-3 at 1-2 (not only notifying of the missed payments but also warning Hilgartner that the legal enforcement of the Settlement Agreement may entail "initiating litigation, to seek not only the balance of the past-due amounts owed to her under the Settlement Agreement, but also seek an acceleration of the remaining payments due under the Settlement Agreement").  That Hilgartner could exercise his ability to file for bankruptcy at his sole discretion as a weapon against the enforcement of an otherwise non-dischargeable claim would undermine the gravamen of the Settlement Agreement in the first place—to make Yagi whole for the personal injuries she suffered as a result of Hilgartner's willful and malicious conduct.

D.  Whether, at trial, Yagi properly introduced a summary of her claim before the Bankruptcy Court?

Hilgartner argues that Yagi improperly introduced a summary of her damages at trial over an objection pursuant to Federal Rule of Evidence 1006.  Hilgartner claims that Yagi never provided him the evidence from which the summary had been compiled and that the information contained in the summary constituted inadmissible hearsay.  Yagi contends that she testified directly about the information contained in the summary prior to its introduction, including the calculation methodologies.  She also notes that Yagi was well-aware of the summary given it had been filed before this Court, in the Adversary Proceeding, and as part of the proof of claims filed in each of Hilgartner's bankruptcy cases.

Federal Rule of Evidence 1006 permits a party to "use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently

examined in court." Fed. R. Evid. 1006. "The proponent must make originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place." *Id.* Yagi made this exact summary of damages available to Hilgartner long before its introduction at trial on May 21, 2021. Dkt. 5 at 112. *See, e.g.*, Case No. 1:19-cv-01305, Dkt. 1-2 (E.D. Va. Oct. 10, 2019); Case No. 20-10695-BFK, Dkt. 19-3 (Bankr. E.D. Va. May 31, 2020); Case No. 20-01049-BFK, Dkt. 1-3 (Bankr. E.D. Va. July 23, 2020). Therefore, the summary was properly admitted in accordance with Federal Rule of Evidence 1006. And unsurprisingly, Hilgartner did not object to the information from which the summary was prepared because it relied on the payment schedule outlined in the Settlement Agreement—which had been properly admitted into evidence. *See Cates v. Morgan Portable Bldg. Corp.*, 780 F.2d 683, 691 (7th Cir. 1985) ("Obviously a settlement agreement is admissible to prove the parties' undertakings in the agreement, should it be argued that a party broke the agreement."); 2 Weinstein & Berger, Weinstein's Evidence 408(5), at 27 (1981). After Yagi's counsel properly laid a foundation as to her personal knowledge in the preparation of the ledger, Yagi testified line-by-line as to the summary of damages reflecting the payments due under the Settlement Agreement and their method of calculation. *See* Dkt. 5 at 85-105; *see also Courts v. Wiggins*, No. 5:16-cv-00054, 2018 WL 10609718, at *3 (W.D. Va. Feb. 21, 2018) (holding summary of plaintiff's damages is admissible under Fed. R. Evid. 1006). The Bankruptcy Court properly overruled the objections.

Accordingly, the summary of damages was properly admitted by the Bankruptcy Court and is the proper document upon which the Bankruptcy Court should revise the allowable amount of non-dischargeable interest upon remand.

### IV. CONCLUSION

For the reasons stated above, it is hereby ORDERED that the judgment of the Bankruptcy Court as to the dischargeability of Creditor/Appellee's Personal Injury Proof of Claim is AFFIRMED in part and REVERSED in part; and it is

FURTHER ORDERED that the Bankruptcy Court's Report and Recommendation and its Supplemental Report and Recommendation are ADOPTED in part and AMENDED in part; and it is

FURTHER ORDERED that the case is REMANDED to the Bankruptcy Court Adversary Proceeding in Case No. 20-1049-BFK for purposes of revising the allowable non-dischargeable interest amount in accordance with this Court's opinion; and it is

FURTHER ORDERED that the stay in 1:19-cv-01305 before this Court remains in place pending the resolution of the bankruptcy proceedings upon written notice of the parties.

The Clerk is directed to file this Memorandum Opinion and Order on the dockets for both Case No. 1:21-cv-01179 and Case No. 1:21-cv-01123, forward a copy of this Memorandum Opinion and Order to counsel of record for all parties, and to close these civil actions.

It is SO ORDERED.

Alexandria, Virginia
June 30, 2022

/s/

Rossie D. Alston, Jr.
United States District Judge